# EXHIBIT C

## AMERICAN ARBITRATION ASSOCIATION

### AAA NO. 71-160-00563-13

| | |
|---|---|
| **TAMI PENDERGRAFT,** | § |
| | § |
| **Claimant,** | § |
| | § |
| **v.** | § |
| | § |
| **ARISE VIRTUAL SOLUTIONS INC.,** | § |
| | § |
| **Respondent.** | § |

---

### ARBITRATOR'S INTERIM AWARD

---

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the Arise–Virtual Services Master Agreement between Lumbu Incorporated and Arise Virtual Solutions Inc., dated January 10, 2012, and having been duly sworn and having duly heard the allegations and proof submitted by the parties, AWARD, as follows:

### INTRODUCTION

After filing suit in federal court and being compelled to individual arbitration, Claimant Tami Pendergraft made a demand for arbitration against Respondent Arise Virtual Solutions Inc., before the American Arbitration Association on October 3, 2013. Her claim challenges Arise's wage payment and invoked the protections of the Fair Labor Standards Act ("FLSA"). On November 13, 2013, Arise filed its answering statement and counterclaim seeking to recover as unjust enrichment the compensation paid to Ms. Pendergraft pursuant to her servicing of an Arise customer through a third-party vendor. Ms. Pendergraft answered the counterclaim on November 27, 2013.

1

On January 23, 2014, the American Arbitration Association confirmed the appointment of Deborah G. Hankinson to serve as the arbitrator. The arbitration proceedings were conducted according to the American Arbitration Association's Employment Arbitration Rules,

During the course of the arbitration proceedings, the parties further specified their claims to identify the amount each sought to recover and the other relief sought, and each party responded to the specifications. After conducting discovery, the parties filed pre-hearing briefs.

The arbitration hearing began on September 29, 2014. For two days, the parties presented witness testimony, documentary evidence, and the argument of counsel. At the conclusion of the hearing, the parties agreed to a post-hearing briefing schedule and to defer the attorneys' fees submission schedule until after the issuance of an interim award on the merits of their other claims and counterclaims and their respective defenses. The parties filed post-hearing briefs on November 25, 2014. Consistent with the parties' agreement, the arbitration proceedings have not closed, have remained open, and will remain open after the issuance of this Interim Award.

Having considered all the evidence, the applicable law, and the arguments of counsel, the Arbitrator issues this Interim Award that Claimant Tami Pendergraft recover $11,683.64 from Respondent Arise Virtual Solutions Inc., and that the parties submit either their evidence and briefing relevant to Ms. Pendergraft's claim for attorney's fees, or alternatively, their stipulation relevant to the amount of attorney's fees and costs to be awarded to Claimant Tami Pendergraft.

### FINDINGS OF FACT

1.       Arise advertises itself as "the pioneer of the virtual call centre industry." (Claimant's Ex. 3, at "Arise International"). Its business model is based upon providing its clients, which are large companies such as AT&T, Carnival Cruise Lines, and Barnes & Noble, with a customer-service workforce that Arise has labeled Client Support Professionals or

2

"CSPs." To provide this service, Arise has invested in software and other infrastructure that allows "third-party vendors" who "do not have the resource stream to support purchasing the infrastructure" necessary to provide call-center services to purchase access to Arise's infrastructure and in turn to provide call-center services to Arise's customers. (*Id.* at "Customer Contact Solutions"). Arise explains that it "save[s] [its] clients millions of dollars in up-front recruiting and training delivery expenses because Arise and its [CSPs] absorb the certification costs, eliminating the salaries for instructors and payments for those being certified." *Id.* Arise also reduces costs for clients by not paying CSPs for "any unproductive periods, such as call-wait time, breaks, lunch or vacation time, or most certification time." (*Id.*)

2.　　Ms. Pendergraft worked out of her home to provide customer support to Arise's clients. Arise does not label CSPs like Ms. Pendergraft as employees of its company, but instead classifies them as independent contractors or employees of third-party vendors known as "IBOs" (Independent Business Owners). To work for Arise, CSPs must either form their own corporation to become an IBO or work as a CSP for someone else's IBO.

3.　　Ms. Pendergraft did not have any call-center or customer-service experience similar to the work at Arise before working as a CSP, and she did not work for any other business (as either an employee or an independent contractor) during the time she worked at Arise. She first heard about Arise through a friend who knew that she was looking to work from home following a back injury. Ms. Pendergraft's friend put her in touch with Mari Lumbu, who worked for Arise as an IBO. With full understanding that Arise does not contract with individuals and that "you have to be an independent business contractor," Ms. Pendergraft chose not to form her own IBO and instead contacted Ms. Lumbu after receiving Ms. Lumbu's contact information from her friend. Ms. Pendergraft expected to enter into a long-term employment

3

relationship with Arise and understood that Ms. Lumbu was merely a pass-through whose IBO number would enable her to work for Arise.

4. Before coming in contact with Ms. Pendergraft, Lumbu Incorporated had been established as an IBO, duly incorporated in the state of Texas by Mari Lumbu, and had retained other individuals to provide services on its behalf. Lumbu Incorporated signed a Master Services Agreement ("MSA") with Arise, effective January 10, 2012, to provide services on various customer-service projects as an independent contractor of Arise.

5. Lumbu Incorporated and Ms. Pendergraft entered into their own written agreement. In an e-mail dated July 16, 2012, Ms. Pendergraft agreed to a contract with Lumbu Incorporated that required Ms. Pendergraft to provide a minimum number of hours of servicing and comply with a set of service-level requirements. The agreement also indicated that Lumbu Incorporated would withhold a 9.7% service fee from the base-rate calculation provided in the agreement. Agreements like these are entirely up to the discretion of the IBO, as are its relationship with its CSPs, and Arise played no part in any of these discussions. This is consistent with the MSA, in which Lumbu Incorporated represented to Arise that it would be solely responsible for providing employment compensation and benefits to all persons engaged by Lumbu Incorporated such as Ms. Pendergraft. Ms. Pendergraft acknowledged this by executing an Acknowledgement and Waiver Agreement with Lumbu Incorporated in which she represented and agreed that Lumbu Incorporated was solely responsible for compensating her and that she was not an employee of Arise.

6. After receiving Ms. Lumbu's IBO number, Ms. Pendergraft signed up on Arise's website, which required her to input her personal-contact information and to upload a resume. Arise then assigned Ms. Pendergraft a personal ID number, called her "ACP ID," and provided

4

her with her own profile on its website. Ms. Pendergraft was also required to sign a nondisclosure agreement with Arise.

7. To work for Arise, Ms. Pendergraft was required to purchase certain equipment. To fulfill these requirements, Ms. Pendergraft purchased two headsets and a computer, and installed a phone line that she dedicated to Arise. These items cost Ms. Pendergraft approximately $1500.

8. Ms. Pendergraft was required to pass Arise's voice assessment and background check, for which she paid Arise approximately $12.95. Arise, and not Ms. Lumbu, administered Ms. Pendergraft's background check and voice assessment.

9. Ms. Pendergraft next was required to enroll in CSP101, a required introductory course that teaches CSPs how to use Arise's system, for which she paid Arise (not Ms. Lumbu) $49.99. The course includes detailed instructions about using Arise's system to provide customer service for its customers and informs CSPs how they should communicate with Arise's clients. Arise explains that "[a]ll concerns regarding service fees, servicing hours, products, services, etc. should be brought to the attention of an Arise operations person **first**." (Claimant's Ex. 6, at 4714.) Ms. Pendergraft spent approximately three full days completing CSP101. She was not paid during this time. Ms. Pendergraft passed CSP101.

10. To provide services in connection with specific projects, Lumbu Incorporated entered into Statements of Work ("SOWs") with Arise pursuant to the MSA. When a CSP or IBO is looking for projects to service, they view opportunity announcements through Arise's online portal. These opportunity announcements outline all of the requirements of a particular opportunity and fully explain the opportunity, so that the CSP or IBO can make an informed decision as to whether to pursue a particular project. The opportunity announcements explain

5

the hours parameters, quality requirements, certification courses, certification costs, and suggested equipment. IBOs, like Lumbu Incorporated, have access to opportunity announcements that also provide information on the service revenue. The CSP version of the same opportunity announcements do not provide this information because Arise pays IBOs and does not know the compensation arrangements an IBO has with its personnel. Arise does not exert any control over what projects CSPs and IBOs choose to pursue.

11.     Ms. Pendergraft signed up to provide customer service for Arise's client, AT&T. Ms. Pendergraft paid Arise $199 for the AT&T certification course. From May 29, 2012, through July 19, 2012, Ms. Pendergraft spent eight hours per day (four hours in class and four hours on homework), Monday through Friday, taking the AT&T certification class. If Ms. Pendergraft had missed more than one training course, Arise would have dismissed her from the class. From July 20, 2012, through July 26, 2012, Ms. Pendergraft spent twenty hours handling live customer calls as part of the nesting phase of her training. From July 27, 2012, through August 6, 2012, Ms. Pendergraft resumed the AT&T training course during which she worked eight hours per day without pay.

12.     The AT&T certification material is AT&T's material. The AT&T certification training is extremely detailed and taught Ms. Pendergraft everything she might need to know about providing service to AT&T's customers with sections titled "Manage Your Thinking to Deliver Great Service" and "The Customer Rules." It provides detailed instructions as to how CSPs should act in almost every possible scenario. If CSPs score 82% or higher on the certification course, they are then permitted to provide customer service for AT&T. If a CSP does not pass the certification or drops out of the course, the fee that she paid Arise for the course is not refunded.

6

13.     Ms. Pendergraft passed the AT&T certification course. Arise then offered Lumbu Incorporated an AT&T SOW, which it accepted and designated Ms. Pendergraft to provide services on the AT&T Business KCA Application. The SOW was set to expire on September 20, 2012.

14.     Ms. Pendergraft was then informed that rather than servicing clients, she would have to take another training course to learn AT&T's National Business Systems ("NBS"). Ms. Pendergraft was told that she would be paid for her time spent in this course. Ms. Pendergraft spent about 80 hours on the NBS training course (four hours in class and about four hours of homework for ten days), but never received pay for this course.

15.     After her NBS training, Ms. Pendergraft began servicing clients. Ms. Pendergraft was required to use Arise's system to sign up for at least twenty hours per week, including at least two hours on the weekend. Arise released the hours at a certain time each week that Arise set, at which point Ms. Pendergraft had to be available to select released hours before they filled up. If twenty hours were not available at the time of the initial release, Ms. Pendergraft had to continue checking Arise's system to see whether additional hours opened up or risk having her SOW terminated. Ms. Pendergraft "had to take the hours [she] would get," which ended up being "late nights and just not very good hours." As a result, Ms. Pendergraft was not free to pick her own hours, but rather, had to work during whatever hours Arise made available.

16.     Arise provided Ms. Pendergraft with unique login credentials that allowed her to access its system, and she was not permitted to give her login information to anyone else. If Ms. Pendergraft wanted to take time off from working without being terminated by Arise for failure to meet its hours requirements, she was required to request a time-away ticket from Arise.

7

17.     The SOW outlined a set of eleven AT&T-driven service-level requirements, which measured the results achieved by Lumbu Incorporated as a result of Ms. Pendergraft's performance. Three of the service-level requirements were tracked by Arise, and the other eight were tracked by AT&T.

18.     Arise closely monitored Ms. Pendergraft's performance, which it measured based on a series of metrics that it also refers to as Key Performance Indicators. (Claimant's Ex. 6, at 4683-712) ("At Arise, performance is measured, analyzed, and managed."). Arise compiled Ms. Pendergraft's scores for each category and created a scorecard that aggregated this data. Arise also recorded all of Ms. Pendergraft's phone calls while she was servicing for AT&T. Arise generated invoices that showed Ms. Pendergraft's earnings based upon her rate of pay (as determined by Arise's metrics) and minutes worked.

19.     Ms. Pendergraft was assigned to two different types of supervisors, who monitored and assisted with her calls. Like CSPs, Arise also classifies these supervisors as independent contractors or employees of IBOs. Chat supervisors, who are called Performance Facilitators or "PFs" by Arise, were logged into chat rooms with Ms. Pendergraft while she was providing customer service and provided feedback if she reached out for assistance during calls. The supervisors also had the ability to take control of Ms. Pendergraft's sessions if they deemed it necessary because she was struggling with a customer. The supervisor would explain to the customer that she was Ms. Pendergraft's supervisor and that she would be assisting with the call. Quality assurance supervisors, who are called Quality Assurance Performance Facilitators or "QAPFs" by Arise, listened to Ms. Pendergraft's calls in real-time, and could speak to her to provide guidance during the call. They also listened to Ms. Pendergraft's recorded calls and graded them based upon Arise's metrics using forms provided by Arise. These scorecards listed

8

factors for evaluation such as whether Ms. Pendergraft used the customer's name and whether there was any silence during the conversation, as well as subjective elements such as courtesy, tone of voice, clarity of voice, and whether Ms. Pendergraft was trying her best to resolve the issue. Arise factored these grades into the metrics that determined Ms. Pendergraft's rate of pay, and they were also factored into Arise's decisions about whether to terminate her.

20. Ms. Pendergraft was diligent about meeting with her supervisors each week and spent about two hours or more in required group meetings, referred to as huddles, or one-on-one sessions with her supervisor. The supervisors had access to Ms. Pendergraft's scorecards and customer-survey reports, so that they could assist her in meeting Arise's metrics. Arise tracks whether CSPs like Ms. Pendergraft meet with their supervisors, and considers attendance at one-on-one sessions and group huddles when determining whether to terminate a CSP.

21. Ms. Pendergraft could have been paid at a rate of $9, $11, or $14 per hour, which was determined by the metric scores that were calculated by Arise. If Ms. Pendergraft failed to meet any aspect of her SOW (including the metrics required by Arise), Arise could terminate her contract. Arise often terminates the work of CSPs at any point during the term of an SOW, not just at the end of the contract period. In order for CSPs to ensure that they are in compliance with the maximum average handle time, they must cut some calls short before resolving a problem. Because the problem is not resolved, cutting a call short will negatively impact their Customer Satisfaction score. The difficulty in meeting all metrics at once means that most CSPs are typically in violation of at least one of their metrics at any given time, even if they are also a top performing CSP. Arise uses its discretion to make termination decisions when CSPs are in violation of their metrics and does not terminate all CSPs who fail to satisfy their metrics.

9

22.     Arise generated detailed invoices tracking Ms. Pendergraft's work and the rate she was to be paid for this work. Although Arise's invoices show that Ms. Pendergraft spent 17.19 hours on the phone with clients throughout July and August, these hours are only a small percentage of the time that Ms. Pendergraft actually spent working. In addition to her time spent on the phone with customers, Ms. Pendergraft had to spend additional time waiting for technical support, researching customer issues, and returning calls known as commitments. Arise's invoices also do not include any of this time or the time that Ms. Pendergraft spent in the huddles and one-on-ones with her supervisors each week. When the time spent on these required activities is added to the twenty hours per week (spread out in thirty-minute intervals) during which CSPs must be available to take calls for Arise's clients, the work is equivalent to a full-time job. Ms. Pendergraft therefore worked for about forty hours per week for three weeks.

23.     Ms. Lumbu played no role in Ms. Pendergraft's decision to take the training for AT&T and no role in which hours Ms. Pendergraft was able to provide service. Ms. Lumbu never graded any of Ms. Pendergraft's calls, provided any feedback on her performance, or participated in or spoke with Ms. Pendergraft about attending huddles and one-on-one meetings with Arise supervisors. Ms. Pendergraft understood Ms. Lumbu's role to be merely that Arise would pay Ms. Lumbu, Ms. Lumbu would take a percentage of Ms. Pendergraft's pay, and then Ms. Lumbu would pass the money on to Ms. Pendergraft. Throughout her time working for Arise, Ms. Pendergraft never met Ms. Lumbu in person.

24.     Ms. Pendergraft was not paid for most of her time spent working for Arise, receiving only one check for $96.12. When she contacted Arise, asking for help to collect the money that was owed to her, its representative responded only that she needed to direct any questions regarding her payment to her IBO.

10

25.    Frustrated by the circumstances, Ms. Pendergraft quit working for Arise in August 2012, and she has not performed any customer-service work since then.

26.    The minimum wage for Ms. Pendergraft's uncompensated hours is:

CSP101 Training Time (unpaid):        $174.00 ($7.25 x 3 days x 8 hours)
AT&T Certification Time (unpaid):     $2,552.00 ($7.25 x 44 days x 8 hours)
NBS Certification Time (unpaid):      $580.00 ($7.25 x 10 days x 8 hours)
Hours Worked:                         $870.00 ($7.25 x 3 weeks x 40 hours)
Total:                                $4,176.00
Amount Paid:                          - $96.12

Total owed:                           $ 4,079.88

27.    The amount Ms. Pendergraft spent on equipment and training to work for Arise is:

Background Check:          $12.95
Home Office Equipment:     $1500.00
CSP101:                    $49.99
AT&T Certification:        $199.00

Total:                     $1,761.94

28.    The total for Ms. Pendergraft's equipment and training costs and uncompensated minimum-wage is $5,841.82.

CLAIMS AND COUNTERCLAIMS

Ms. Pendergraft claims that Respondent Arise Virtual Solutions Inc., misclassified her as an independent contractor in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-219, and as a result, failed to pay her the minimum wage for all the weeks she worked. She claims $4,079.88 is owed as minimum wage for uncompensated hours, less the amount she has been paid, and $1,761.94 that she spent on equipment and training to work for Arise. Thus, the total amount that she seeks to recover for equipment and training costs, and minimum-wage damages is $5,841.82. She also seeks to recover statutory liquidated damages, her attorney's fees, and costs.

11

Arise denies that Ms. Pendergraft was its employee and has brought a counterclaim for unjust enrichment in the event that Ms. Pendergraft prevails on her FLSA claim. According to Arise, by claiming retroactively that she was an employee and that she was not properly compensated for the services she promised to render through an independent contractor, Ms. Pendergraft has breached her agreement with Lumbu Incorporated (and, in turn Lumbu Incorporated's agreement with Arise) and therefore Arise should be allowed an offset for the fees that she has retained.

**ANALYSIS AND CONCLUSIONS**

***FLSA Claims***

Under the FLSA, courts look to the "economic reality" of a working relationship to determine whether a worker is an employee. *Scantland v. Jeffrey Knight, Inc.*, 721 F.3d 1308, 1311 (11th Cir. 2013); *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1311 (5th Cir. 1976). "[T]his inquiry is not governed by the 'label' put on the relationship by the parties or the contract controlling that relationship, but rather focuses on whether 'the work done, in its essence, follows the usual path of an employee.'" *Scantland*, 721 F.3d at 1311 (quoting *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 727 (1947)); *see also Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1044 (5th Cir. 1987) ("[F]acile labels and subjective factors are only relevant to the extent that they mirror 'economic reality.'") (quoting *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961)). Courts have interpreted the law this way to avoid situations in which the nature of the relationship between the parties reflects that of an employer and employee in every way, but the employer aims to avoid this fact by creating a contract, and using labels that say otherwise. *See, e.g., Mednick v. Albert Enters., Inc.*, 508 F.2d 297, 300 (5th Cir. 1975) ("The statutory coverage [of the FLSA] is not limited to those (whose work activities satisfy the

12

common law 'control' test) but rather to those who, as a matter of economic reality, are dependent upon the business to which they render service.").

Several factors guide the application of the economic-realities test to determine whether a worker is an employee: (1) the nature and degree of the employer's control; (2) the employee's opportunity for profit or loss depending upon her managerial skill; (3) the employee's relative investment in equipment or materials; (4) whether the service rendered requires a special skill; (5) the degree of permanency and duration of the working relationship; and (6) the extent to which the service rendered is an integral part of the employer's business. *Scantland*, 721 F.3d at 1311; *see Reich v. Circle C. Invs., Inc.*, 998 F.2d 324, 327 (5th Cir. 1993). In determining whether the economic reality reflects an employee relationship, the ultimate question is "whether the individual is 'in business for himself' or is 'dependent upon finding employment in the business of others.'" *Scantland*, 721 F.3d at 1312 (quoting *Mednick*, 508 F.2d at 301-02). If the answer is no, the plaintiff is an employee protected by the FLSA. *Mednick*, 508 F.2d at 302. For example, in *Mednick*, the plaintiff cardroom operator at an apartment house had the ability to set his own hours, the discretion to hire and fire his own employees. He received compensation exclusively from third parties and performed work that was not an integrated part of defendant's business. Because his patrons' access to the cardrooms was controlled by the defendant and there was no economic substance behind the powers he exercised, the Fifth Circuit determined that the plaintiff had nothing that could be called a business and had only the appearance to some degree of being an independent contractor. As a result, the court concluded that he was an employee for purposes of the FLSA. *Id.* at 302-03.

Ms. Pendergraft contends that whether examining each of the economic-reality factors one-by-one, or assessing the facts as a whole, the evidence weighs in favor of concluding that

13

she is properly classified as an employee of Arise. Alternatively, Ms. Pendergraft argues that if she was an employee of Mari Lumbu's IBO, as Arise contends, then Arise was at least her joint employer.

Arise responds that Ms. Pendergraft failed to satisfy her burden to prove that she was an Arise employee and not an independent contractor. Arise focuses on the fact that the parties themselves designated an independent-contractor relationship and that the evidence supports a finding that the parties undeniably communicated their intent to enter into an independent-contractor relationship. Additionally, Arise contends that an analysis of all the economic-reality factors lends further support to the conclusion that the parties subjectively intended and objectively understood that Pendergraft was not an employee of Arise.

To start, Arise argues that the formal relationships between and among Arise, Lumbu Incorporated, and Ms. Pendergraft, the documents describing those relationships, and the parties' subjective intent and objective understanding inform the economic-realities analysis. *See Scantland*, 721 F.3d at 311. As support, Arise relies upon: (1) the documents that Ms. Pendergraft saw or received indicating that she would not have an employment relationship with Arise; (2) Ms. Pendergraft's agreement with Lumbu Incorporated in which she acknowledged she was not an employee of Arise; and (3) Ms. Pendergraft's understanding that she was not an employee of Arise and that she did not hold herself out as an employee of Arise. Case law interpreting and applying the FLSA does not support Arise's argument. The label given the relationship at issue, the formal contract, and Ms. Pendergraft's subjective understanding of her work status under the law do not inform the question of whether Ms. Pendergraft was an Arise employee under the economic-realities test, much less control the outcome of the analysis. *See Scantland*, 721 F.3d at 1311; *Brack*, 814 F.2d at 1044; *Gate Guard Servs. L.P. v. Solis*, No. V-

14

10-91, 2013 WL 593418, at *11 (S.D. Tex. Feb. 13, 2013) (parties' designation of independent contractor-relationship is "relevant where it mirrors economic reality"). Rather, the inquiry is fact intensive and focuses on the economic-realities of the work relationship itself. *Scantland*, 721 F.3d at 1311; *Mednick*, 508 F.2d at 302.

The Arbitrator is also not prepared to accept Ms. Pendergraft's invitation to decide anything other than whether Ms. Pendergraft was an employee of Arise or a joint employee of Arise and Lumbu Incorporated for purposes of the FLSA. The fact-intensive inquiry required by this individual arbitration concerns Ms. Pendergraft's circumstances and her relationship with Arise and Lumbu Incorporated. That analysis follows.

*Control.* Arise argues that Ms. Pendergraft has failed to establish that Arise exercised control over the "manner and method" (the details) of her servicing, which justifies a finding that Ms. Pendergraft was not an employee of Arise. The Arbitrator disagrees with the control standard that Arise advocates.

The economic-realities test is broader than the common-law right-to-control test used to determine whether a worker is an employee or an independent contractor. *See Slayman v. FedEx Ground Package Sys., Inc.*, 765 F.3d 1033, 1047 (9th Cir. 2014) (analyzing Oregon law and noting that "[t]he economic-realities test is broader than the right-to-control test, covering situations where the worker is not directed or controlled by the employer but, nevertheless, as a matter of economic reality, depends on the employer."); *Mednick v. Albert Enters., Inc.*, 508 F.2d 297, 300 (5th Cir. 1975) ("The statutory coverage [of the FLSA] is not limited to those (whose work activities satisfy the common law 'control' test) but rather to those who, as a matter of economic reality, are dependent upon the business to which they render service."). "Control is only significant when it shows an individual exerts such a control over a meaningful part of the

15

business that she stands as a separate economic entity." *Scantland*, 721 F.3d at 1313 (quoting *Usery*, 527 F.2d at 131); *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 343 (5th Cir. 2008). As a result, the question presented about control under the FLSA is whether, as a matter of economic reality, the worker is dependent upon the business to which she renders service. *Mednick*, 508 F.2d at 300.

Arise exercised significant control over Ms. Pendergraft from when she first signed up to be a CSP through Arise's website. Arise collected and stored Ms. Pendergraft's personal information, required Ms. Pendergraft to pass several evaluations that it administered, and provided her with detailed training so that she could perform her work according to Arise and its customer's requirements. *See Robles v. RFJD Holding Co.*, 2013 WL 2422625, *4 (S.D. Fla. June 3, 2013) (holding that "[t]he provision of training . . . indicated an employee-employer relationship."); *Craig v. FedEx Ground Package Sys., Inc.*, 335 P.3d 66, 85 (Kan. 2014) ("Whether FedEx trains its drivers is a factor [in determining employee status] because ordinarily one does not hire an independent contractor that requires training."). Once Ms. Pendergraft began providing support for its customer, Arise closely monitored all aspects of her work, and used the data it collected to determine what rate Ms. Pendergraft would be paid, and whether she would continue to work for Arise's customer. Arise assigned supervisors to work with Ms. Pendergraft, both to evaluate the work that she was doing and to assist in the event that she was having trouble with a customer's question.

The case law recognizes facts like these as evidence of employee status. In *Kerce v. W. Telemarketing Corp.*, 575 F. Supp. 2d 1354 (S.D. Ga. 2008), for example, plaintiffs challenged their status as independent contractors with a telemarketing service whose business model was like Arise's. Similar to Arise, the defendant "provide[d] reports to its clients that measure[d] the

16

home agents' performance in several areas, including average handle time, call volume, average speed of answer, sales per hour, rate of abandonment, quota attainment, and order conversion percentages." *Id.* at 1360. The court found that this control weighed in favor of employee status. *Id.*

In *Scantland*, the Eleventh Circuit found that cable technicians "were subject to meaningful supervision and monitoring by [defendant]" when, like Ms. Pendergraft, they were required to log in and out of a service that indicated when they arrived at and completed jobs, the defendant reviewed the technicians' work and tracked their quality control ratings, and the defendant could give technicians remedial training or terminate them if their ratings were consistently low. 721 F.3d at 1314. The court in *Scantland* also found evidence of control because the defendant could deduct money from technicians' pay where they failed to meet certain requirements. *Id.* The deductions in *Scantland* are analogous to Arise's ability to lower Ms. Pendergraft's rate of pay if she failed to meet certain metrics.

In *Robles*, a federal district court determined that a commercial cleaning business exercised significant control over cleaners when the defendant had multiple supervisors who regularly oversaw the cleaners' work, were responsible for orienting the cleaners to their initial jobs, and monitored compliance with their contracts. 2013 WL 2422625, *4. The role of the supervisors in *Robles* is analogous to that of Ms. Pendergraft's supervisors at Arise. The court in *Robles* also found evidence of control in the fact that the cleaning business provided the cleaners with detailed checklists based upon customer specifications. *Id.* Similarly, during certification training, Arise provided Ms. Pendergraft with detailed scripts for speaking to customers. *See Hill v. Cobb*, 2014 WL 3810226, *5 (N.D. Miss. Aug. 1, 2014) (finding control weighed in favor of employee status when agents were required to use the defendant's contract and were

17

reprimanded for deviating from required practices, and defendant had delegated supervisory authority); *Parrilla v. Allcom Constr. & Installation Servs., LLC*, 2009 WL 2868432, *3 (M.D. Fla. Aug. 31, 2009) (evidence of control when defendant supervised the manner in which technicians carried out their work, provided them with specifications on how to perform work and assessed monetary penalties based on performance (that technicians had no way to dispute or negotiate), supervisors monitored technicians after or during jobs, and technicians had to request time off or risk being penalized).

Arise counters with other evidence that it claims weighs against employee status. First, Arise's customers, and not Arise, set the requirements for the CSPs who worked on the customers' SOWs. Courts, however, have not been persuaded that this fact weighs against employee status. In *Sakacsi v. Quicksilver Delivery Sys., Inc.*, a courier service argued that many of the requirements it imposed on its drivers were attributable to its customers' requirements. 2007 WL 4218984, *5 (M.D. Fla. Nov. 28, 2007). The court rejected this argument, explaining: "The Court finds this argument unpersuasive in light of the fact that [a]ny employer's business is, in essence, dictated by the needs of its customers. . . . The key inquiry, rather, is how QDS goes about meeting the [customers'] needs, and to what extent the chosen methods operate to control the activities of QDS drivers and in turn restrict their autonomy." *Id.*; *see also Alexander v. FedEx Ground Package Sys., Inc.*, 765 F.3d 981, 995 (9th Cir. 2014) (noting that "[t]he customers are FedEx's customers, not the drivers' customers."); *Robles*, 2013 WL 2422625, *5 ("While Defendants—as all businesses to some degree—may certainly have been concerned with 'customer satisfaction,' Defendants manifested that concern through closely controlling and monitoring Plaintiffs' work habits and methods. Accordingly, the first factor weighs in favor of finding that Plaintiffs were 'employees' under the FLSA.").

18

Next, Ms. Pendergraft, and not Arise, controlled which hours she worked, or which clients she worked for. Courts have determined that this evidence alone does not show the requisite "control over a meaningful part of the business" to weigh against employee status. *See, e.g., Usery*, 527 F.2d at 1312 ("[Workers] who work at home, completely free of specific hour requirements, have been found to be employees for purposes of [the FLSA].") (citing *Goldberg*, 366 U.S. at 32); *see also Mednick*, 508 F.2d at 299 (concluding that plaintiff was an employee although defendant "did not set hours" or "even require that [plaintiff] be present"); *Hill*, 2014 WL 3810226, *4 (finding control weighed in favor of employee status although "[i]t [was] undisputed that [plaintiff] was required to work no specific hours, and could come and go as he pleased"); *Robles*, 2013 WL 2422625, at *3 (finding control weighed in favor of employee status although defendants "were concerned only with customer satisfaction and not the day-to-day regulation of Plaintiffs' "work habits, hours worked, or work methods."); *Harrell v. Diamond A Entm't, Inc.*, 992 F. Supp. 1343, 1349 (M.D. Fla. 1997) (finding that a worker's "freedom to work when she wants and for whomever she wants" did not amount to control over a meaningful part of the business).

Because Ms. Pendergraft had to be available to sign up whenever Arise released the hours, and she had to take whatever was available in order to meet Arise's minimum requirements, she was not completely free to choose her hours. The hours available to her were not desirable (*e.g.*, late nights) and did not make for a cohesive schedule. If sufficient hours were not available for her to meet the minimum requirements, then Ms. Pendergraft was required to keep checking for additional hours to be released. Ms. Pendergraft was also required to attend training classes and meetings with her supervisors at certain times. When a company has this type of involvement with a worker's hours, it can constitute control over her schedule. *See*

19

*Slayman v. FedEx Ground Package Sys., Inc.*, 765 F.3d 1033, 1043 (9th Cir. 2014) (concluding that FedEx had the right to control its drivers when it did not set specific working hours, but "[t]he combined effect of [its] requirements [was] substantially to define and constrain the hours that FedEx's drivers can work"); *Scantland*, 721 F.3d at 1313-14 (technicians' agreements, which provided that they could decline any work assignments, but in reality they could not reject work without the threat of termination or reduced assignments, and might be required to attend various meetings was evidence of control); *Clincy v. Galardi S. Enters., Inc.*, 808 F. Supp. 2d 1326, 1332 (N.D. Ga. 2011) (finding defendant nightclub owners had control over dancers' schedules when the dancers could choose which shifts to sign up for, but were fined or disciplined for not working on scheduled nights without calling ahead, and dancers were asked to work a certain number of slow days and would be fined if they failed to meet the requirements); *see also Usery* 527 F.2d at 1312 ("It is not significant how one 'could have' acted under the contract terms. The controlling economic realities are reflected by the way one actually acts.").[1]

On this record, any control that Ms. Pendergraft exerted did not evidence "such control over a meaningful part of the business that she stands as a separate economic unit." *Scantland*, 721 F.3d at 1313. As a matter of economic reality, Ms. Pendergraft instead was dependent upon Arise. *See Mednick*, 508 F.2d at 300. The control factor weighs in favor of employee status.

*Significant Opportunity for Profit and Loss.* The only way Ms. Pendergraft could increase her earnings was to sign up for more hours with Arise (if she was able to), and work within Arise's system to increase her pay rate (from $9 to $14 per hour) by increasing her metrics. Courts have found that payment by the hour or time, rather than by the job, is suggestive of employee status. *See Chapman v. A.S.U.I. Healthcare & Dev. Ctr.*, 562 F. App'x

---

[1] The Arbitrator is not persuaded that the cases cited by Arise on the control issue lead to a different result on the evidence presented.

20

182, 184-85 (5th Cir. 2014) (when defendant "determined how much to pay [plaintiffs] on an hourly basis and when to increase their hourly rate" and "[t]here was no opportunity for the plaintiffs to profit beyond their hourly wage, and they were not at risk to suffer any capital losses," there was evidence of control) *cert. denied*, 134 S. Ct. 2733 (2014).

Ms. Pendergraft had no real opportunity, given her circumstances, to generate profit and loss based on her managerial skill. Arise advertised to attract big businesses like AT&T to use the workforce it had created. Ms. Pendergraft had no means to attract these customers on her own and no means to provide customer service for clients other than by using Arise's software. Ms. Pendergraft never provided customer service for clients outside of the time she spent working for Arise. Courts have found that in similar circumstances, the opportunity for profit and loss weighs in favor of employee status. *See Kerce*, 575 F. Supp. 2d at 1361 (finding that opportunity for profit and loss weighed in favor of employee status when plaintiffs only responded to, and did not initiate, calls that defendants' clients generated, the plaintiffs' training was specific to a particular client, and plaintiffs had no control over call volume); *see also Brock*, 814 F.2d at 1050 (firework-stand operators did not have significant opportunity for profit and loss when defendant controlled the advertising and prices at which the fireworks were sold); *Usery*, 527 F.2d at 1313 (opportunity for profit or loss weighed in favor of employee status when determinants of customer volume were controlled by defendant). Similarly, in this case, the opportunity for profit and loss weighs in favor of employee status.

*Relative Investment in Equipment.* In measuring an employee's investment in equipment or materials, courts look at the alleged employee's relative investment as compared with that of the alleged employer. *Reich*, 998 F.2d at 327. Ms. Pendergraft purchased her own computer equipment. The equipment she purchased allowed her to access Arise's online tools, without

21

which she could not deliver customer support for large businesses. Her investment was extremely minor when compared with the substantial investment that Arise made in the software that is used (and was necessary) to service its clients. *See, e.g., Sakacsi*, 2007 WL 4218984, *7 (finding relative investment weighed in favor of employee status when courier service's cost for purchasing software used to scan deliveries into system far outweighed the drivers' costs for the purchase of cars, gas, maintenance, and automobile insurance); *Clincy*, 808 F. Supp. 2d at 1346-47 (relative-investment factor weighed in favor of employee status when dancer's $50,000 annual investment related to her work did not exceed the nightclub's investment in its business) *see also Brock*, 814 F.2d at 1053 (relative-investment factor weighed in favor of employee status when "[b]ut for [defendant's] provision of all costly necessities, [plaintiffs] could not operate"). The relative-investment factor weighs in favor of employee status.

*Skill and Initiative.* No prior experience or training was necessary in order for a CSP, like Ms. Pendergraft, to work for Arise, and Ms. Pendergraft was required to undergo two detailed trainings, which provided instruction about effective customer service before she could work for Arise. *See Alexander*, 765 F.3d at 995 (skill factor weighed in favor of employee status when plaintiffs "need no experience to get the job in the first place"); *Kerce*, 575 F. Supp. 2d at 1361 (finding evidence of employee status when there was no special skill required beyond the training offered by the defendant); *Parrilla*, 2009 WL 2868432, *5 (no special skill required when technicians underwent two-week training at start of employment). The fact that CSPs could increase their hourly rate (within the parameters set by Arise) by performing well according to Arise's metrics does not exhibit the kind of skill that is relevant to this factor. Rather, courts have held that initiative, not efficiency, is the standard for economic independence. *See Usery*, 527 F.2d at 1314 ("Routine work which requires industry and

22

efficiency is not indicative of independence and nonemployee status. . . . All major components open to initiative-advertising, pricing, and most importantly the choice of [customers] with which to deal are controlled by [defendant]."). The skill and initiative required to perform Ms. Pendergraft's job weighs in favor of employee status.

*Long-Term Relationship.* When Ms. Pendergraft signed up to work for Arise, she intended that the job would be long term. This is evidenced not only by her testimony about her subjective intent but also by her commitment of time, effort, and money over several months to train and qualify to work for Arise's customer, AT&T. *See Sales v. Bailey*, 2014 WL 3897726, *11 (N.D. Miss. Aug. 8, 2014) (duration of relationship weighed in favor of employee status when some plaintiffs worked for shorter periods but had "sought an indefinite employment relationship"); *Kerce*, 575 F. Supp. 2d at 1361 (plaintiff's completion of significant training suggested dedication and an intent to establish an ongoing working relationship of some length weighed in favor of employee status). That Ms. Pendergraft quit her work after a short period of time does not undercut her original intent.

In contrast, Arise structured and offered opportunities to IBOs and CSPs, including Ms. Pendergraft, to work for its customers on a short-term basis. Statements of Work offered by Arise on behalf of its customers typically were for three-month periods, and the AT&T SOW that Lumbu Incorporated accepted and under which Ms. Pendergraft provided service to AT&T customers was no exception. Independent contractors are more often hired for short discrete projects. *Thibault v. BellSouth Telecommunications, Inc.*, 612 F.3d 843, 846 (5th Cir. 2010). Arise also points out that Ms. Pendergraft was free to work for other companies while she worked for Arise. Although the evidence is undisputed that this was a nonexclusive relationship, Arise's performance metrics and Ms. Pendergraft's scheduling difficulties effectively precluded

23

her from working for any other company. On all this evidence, the long-term relationship factor does not weigh in favor of or against employee status.

*Role of CSPs in Arise's Business.* Arise's business model consists of selling customer-support services to its clients by providing a technological platform that allows CSPs, through their own or another's IBO, from their homes or elsewhere, to provide customer support for Arise's clients. Arise's business model revolves around selling these customer-support services, as evidenced by the effort Arise puts into recruiting, training, and supervising CSPs, and its advertisements on its own website. [2] Without CSPs, Arise would have no service to sell, and would cease to function. *See Alexander*, 765 F.3d at 996 (holding this factor weighed in favor of employee status because "[t]he work that the drivers perform, . . . is 'essential to FedEx's core business'"); *Robles*, 2013 WL 2422625, *7; *Molina*, 420 F. Supp. 2d at 1287. The control that Arise maintained over the services performed by CSPs is evidence of the importance that Ms. Pendergraft's work as a CSP plays in Arise's business. *See Scantland*, 721 F.3d at 1319 (holding that cable technicians were an integral part of the business when the level of control exercised over technicians showed that this was an important part of the business); *Kerce*, 575 F. Supp. 2d at 1361 (noting that the defendant exerted a great deal of control and influence over its agents because the services they provided constituted an important part of its business). The final

---

[2] Courts have repeatedly rejected companies' attempts to disclaim the true nature of their business. *See, e.g., Schwann v. FedEx Ground Package Sys., Inc.*, 2013 WL 3353776, *5 (D. Mass. July 3, 2013) ("FedEx's attempt to minimize its own characterizations of its services [was] unpersuasive" when "FedEx advertises that it offers package pick-up and delivery services and its customers have no reason to believe otherwise"). *De Giovanni v. Jani-King Int'l, Inc.*, U.S. Dist. Ct. C.A. No. 07-10066-MLW at 98-99 (D. Mass. June 6, 2012) (R. 263-64) (considering the fact that "[t]he Jani-King website offers 'commercial cleaning services,'" as evidence that janitors performed services in the usual course of Jani-King's business - despite defendants' contention that they sold franchises as their usual course of business). *Clincy*, 808 F. Supp. 2d at 1348 (considering the fact that the club's website and billboard featured scantily clad women and it advertised in adult magazines as evidence that nude dancers were integral to its business despite the club's contention that nude entertainment was not its essential function).

24

factor, whether CSPs, like Ms. Pendergraft, are vital to Arise's business, weighs in favor of employee status.

Having studied the law cited by the parties, reviewed all the evidence, and weighed the evidence pursuant to the economic-realities test, the Arbitrator concludes that Arise misclassified Ms. Pendergraft as an independent contractor and that Ms. Pendergraft instead was an Arise employee under the FLSA. Because the Arbitrator has concluded that Ms. Pendergraft was an employee of Arise, there is no need to decide the alternatively presented question of whether Arise was responsible for compliance with the FLSA as Ms. Pendergraft's joint employer.

### *FLSA Remedies*

*Minimum Wage*. As Ms. Pendergraft's employer, Arise is required under the FLSA to compensate her at minimum wage ($7.25 per hour) for all the time that she worked for Arise, including training time. 29 U.S.C. § 206; *see Maynor v. Dow Chem. Co.*, 671 F. Supp. 2d 902, 916 (S.D. Tex. 2009); *Rodriguez v. Carey Int'l, Inc.*, 2004 WL 5582173, *6 (S.D. Fla. Sept. 15, 2004). Ms. Pendergraft was not paid at all for the nearly three months of training she completed to work for Arise, nor was she paid for most of the hours she spent providing service to Arise's clients. Pursuant to fact finding number 26, Ms. Pendergraft is entitled to recover $4,079.88 as minimum-wage damages.

*Expenses*. Ms. Pendergraft seeks to recover the expenses she had to pay to work for Arise, including the cost of her home-office equipment, her background check, and the training courses. *See* Finding of Fact No. 27. Pre-employment expenses are recoverable if they are "primarily for the benefit of the employer," meaning items "which will be used in or are specifically required for the performance of the employer's particular work." *Arriaga v. Fla. Pac. Farms, L.L.C.*, 305 F.3d 1228, 1237 n.10 (11th Cir. 2002).

The background check, CSP101, and AT&T certification were all required in order for Ms. Pendergraft to work for Arise and primarily benefited Arise. The background check allowed Arise to ensure that only those who met its specifications could gain access to its system, and Ms. Pendergraft could not use these background-check results to secure any other employment. The CSP101 course taught Ms. Pendergraft how to use Arise's software and how to be an effective CSP for Arise. The AT&T certification course taught Ms. Pendergraft how to use Arise's software to provide services for Arise's customer AT&T. Neither CSP101 nor the AT&T certification courses benefitted Ms. Pendergraft in any way but to allow her to work for Arise. Arise benefited by training Ms. Pendergraft to satisfy Arise, and its customer AT&T's, needs. *See id.*

The equipment that Ms. Pendergraft bought was also required for her employment and thus was primarily beneficial to Arise. Arise's technology guide explains the minimum computer hardware and software requirements that all CSPs needed to satisfy, and Ms. Pendergraft purchased new equipment to meet these needs. Although Arise argues some of this equipment was for personal use, rather than for use with Arise, Ms. Pendergraft testified that she purchased these items to be able to work for Arise, and thus Arise, not Ms. Pendergraft, primarily benefitted from their purchase.

Pursuant to fact finding number 27, Ms. Pendergraft is entitled to receive $1,761.94 for her training and equipment expenses. *See Arriaga*, 305 F.3d at 1237 (holding that expenses that had to be paid in order to perform the job were recoverable because they drove employees' wages below minimum wage during the first week of work).

*Statutory Liquidated Damages.* The FLSA provides for mandatory liquidated damages when the statute is violated. 29 U.S.C. § 216(b) ("Any employer who violates the provisions of

26

section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, . . . and in an additional equal amount as liquidated damages.")  To avoid statutory liquidated damages, "[a] FLSA-liable employer bears the 'difficult' burden of proving both subjective good faith and objective reasonableness, 'with double damages being the norm and single damages the exception.'" *Alvarez v. IBP, Inc.*, 339 F.3d 894, 910 (9th Cir. 2003) (quoting *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 141 (2nd Cir. 1999)); *see* 29 U.S.C. § 260.

      In order to prove subjective good faith, "the [employer has the burden of proving] that [it] had 'an honest intention to ascertain what [the FLSA] requires and to act in accordance with it.'" *Dybach*, 942 F.2d at 1566-67.  Employers must present evidence of affirmative action taken to try to ensure FLSA compliance in order to meet this high standard for good faith.  *See, e.g.*, *Wajcman v. Inv. Corp. of Palm Beach*, 620 F. Supp. 2d 1353, 1358-59 (S.D. Fla. 2009) (employer showed subjective good faith through testimony that it consulted with attorneys, familiarized itself with the law, and ascertained the practices of similar businesses in the area before implementing tip-pool policy); *Kennedy v. Critical Intervention Servs., Inc.*, 199 F. Supp. 2d 1305, 1307 (M.D. Fla. 2002) (employer showed sufficient evidence of subjective good faith when it sought legal advice concerning its compliance with the FLSA, relying upon a letter and memorandum containing such advice); *Garcia v. Allsup's Convenience Stores, Inc.*, 167 F. Supp. 2d 1308, 1316 (D.N.M. 2001) (employer showed subjective good faith through evidence that it had relied upon qualified professionals retained to provide advice regarding implementation of its payment scheme); *Nelson v. Alabama Inst. For Deaf & Blind*, 896 F. Supp. 1108, 1115 (N.D. Ala. 1995) (employer put forth sufficient evidence of good faith when its director of personnel submitted affidavit stating that she had attended seminars on the FLSA, studied the statutes,

27

regulations, and agency opinions, and traveled to meet with the DOL Wage and Hour specialist, who assured her that her proposed compensation plan was in compliance with the FLSA).

"An employer establishes a good faith defense to liquidated damages by diligently consulting legal specialists and labor specialists and following their advice." *Garcia*, 167 F. Supp. 2d at 1316; *see Fuentes v. CAI Int'l, Inc.*, 728 F. Supp. 2d 1347, 1358 (S.D. Fla. 2010) ("[T]o reap the benefit of the good faith defense of section 260 based on the advice of counsel the defendant must honestly and truly seek the advice of counsel, counsel must give advice that is reasonable in a legal sense, and the defendant must act in strict conformity with that advice."); *see also Barnard v. Intertek USA Inc.*, 2012 WL 3929838, *8 (S.D. Tex. Aug. 2, 2012) *report and recommendation adopted*, 2012 WL 3929872 (S.D. Tex. Sept. 7, 2012) (finding employer did not have sufficient evidence to show good faith where it sought legal advice but the memorandum it received did not definitively show compliance with the FLSA, and defendant took no further steps to determine whether its policy was compliant); *Silas v. Hillsborough Cnty., Florida*, 2006 WL 3133026, *6 (M.D. Fla. Oct. 30, 2006) (employer's letter to DOL seeking to resolve questions about FLSA compliance indicated that the issues were raised by the DOL, not the Defendant, and therefore was not conclusive evidence that Defendant "had an honest intention to ascertain what the FLSA requires"). Arise has presented no evidence of this type. Arise also failed to present any evidence of objective reasonableness, which similarly "requires some duty to investigate potential liability under FLSA." *Friedman v. S. Florida Psychiatric Assocs., Inc.*, 139 F. App'x 183, 186 (11th Cir. 2005) (quoting *Barcellona v. Tiffany English Pub, Inc.*, 597 F.2d 464, 469 (5th Cir. 1979)).

Ms. Pendergraft is therefore entitled to recover $5,841.82 as liquidated damages in addition to her pre-employment expenses and minimum wage. *Dybach v. State of Fla. Dep't of*

*Corr.*, 942 F.2d 1562, 1566-67 (11th Cir. 1991) (Absent showing of both the subjective and objective elements of the good faith defense, liquidated damages are "mandatory."); *see also Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 142 (2d Cir. 1999) ("Liquidated damages are not a penalty exacted by the law, but rather compensation to the employee occasioned by the delay in receiving wages due caused by the employer's violation of the FLSA.") (quoting *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 583-84 (1942)).

**Arise's Counterclaim for Restitution**

Because Ms. Pendergraft has prevailed on her FLSA claim, Arise's counterclaim for unjust enrichment is now at issue. Arise seeks to prevent Ms. Pendergraft from receiving a windfall by retaining payments made by Lumbu Incorporated to her, while being awarded a minimum wage. To succeed on a claim for unjust enrichment under the applicable Florida law, Arise must prove that: Arise has conferred a benefit on Ms. Pendergraft; Ms. Pendergraft has knowledge of the benefit; Ms. Pendergraft accepted or retained the benefit conferred; and the circumstances are such that it would be inequitable for Ms. Pendergraft to retain the benefit without paying fair value for it. *See Ruck Bros. Brik v. Kellogg & Kimsey*, 668 So. 2d 205, 207 (Fla. Dist. Ct. App. 1995). Because the award to Ms. Pendergraft of her minimum wage on this record includes an offset of $96.12, which accounts for the payment that Ms. Pendergraft received from Arise through Lumbu Incorporated, Arise's unjust-enrichment counterclaim is moot. Alternatively, if there is any additional money that should be attributed as payments to Ms. Pendergraft from Arise, the record contains no evidence of the amount, and the Arbitrator declines to order restitution.

*Attorney's fees and costs*. Ms. Pendergraft's claim for attorney's fees and costs will be addressed in the Final Award following the parties' submission of briefing and evidence relevant to this claim.

29

### Interim Award

For the above-stated reasons, Claimant Tami Pendergraft shall recover $11,683.64 from Respondent Arise Virtual Solutions Inc., comprising $5,841.82 for her equipment and training costs and minimum-wage damages, and $5,841.82 as statutory liquidated damages. Ms. Pendergraft shall submit evidence and briefing to support her claim to recover attorney's fees and costs and the amount she seeks to recover no later than February 16, 2015, and Arise shall submit its evidence and briefing in response to Ms. Pendergraft's submission no later than February 25, 2015. Alternatively, if the parties are able to stipulate that Ms. Pendergraft is entitled to recover her attorney's fees and costs and the amount of fees and costs to be awarded to her, then the parties shall submit their stipulation no later than February 16, 2015. The Arbitrator then will issue a Final Award that addresses Claimant's claim for costs and attorney's fees.

DATE: February 4, 2015.

Deborah G. Hankinson, Arbitrator

30